Filed 10/30/24  P. v. DeCutler CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Lassen)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>TERRY ALLEN DECUTLER, JR.,<br><br>        Defendant and Appellant. | C097249<br><br>(Super. Ct. No. 2022-CR0088751) |

Aaron F. (Aaron), Michael D. (Michael), and F.O.[1] went to a neighboring home to confront some individuals who had been harassing Aaron's daughter and F.O.'s girlfriend, C.F.  There, they encountered defendant Terry Allen DeCutler, Jr., and codefendant KeShaun Hattley, and the encounter quickly turned violent.  Defendant produced what looked like an AR-15 rifle, fired one shot at Aaron, and then pulled the trigger twice more

---

[1]     To protect their privacy, we refer to the witnesses by first name and last initial or by their initials.  (Cal. Rules of Court, rule 8.90(b)(10).)

before the rifle misfired. During the encounter, Hattley hit Michael in the head with a baseball bat, causing substantial injuries.

A jury found defendant guilty of attempted murder, assault with a firearm, simple assault, being a felon in possession of a firearm, and discharging a firearm with gross negligence, and found true two firearm enhancement allegations. The trial court sentenced defendant to 17 years in state prison.

On appeal, defendant asserts the judgment must be reversed (1) because the trial court erred in permitting the prosecution to impeach his witness with a misdemeanor prostitution conviction, (2) due to prosecutorial misconduct in closing argument, and (3) based on the cumulative effect of these errors. Defendant further asserts that (4) his conviction of being a felon in possession of a firearm must be reversed because the charging statute, as applied to him, violates the Second Amendment. We affirm.

BACKGROUND

A consolidated information charged defendant with attempted murder (Pen. Code, §§ 664, 187, subd. (a); count I),[2] assault with a firearm (§ 245, subd. (a)(2); counts IV & V), possession of a firearm by a felon (§ 29800, subd. (a)(1); count VI), and discharging a firearm with gross negligence (§ 246.3, subd. (a); count VII). In connection with count I, the information included two firearm enhancement allegations. (§ 12022.53, subds. (b), (c).)

*The Trial—Relevant Portions of the Prosecution Case*

Aaron and his wife, R.F., lived in a mobile home park near Susanville in Lassen County. Michael, who was not related to them but who considered Aaron to be like a father, also lived with them. C.F., R.F., and Aaron's daughter, lived with her children in another home in the mobile home park.

---

[2]     Further undesignated section references are to the Penal Code.

Hattley and his girlfriend had been "harassing" C.F. for days, claiming she had their dog. On the afternoon of March 5, 2022, C.F.'s boyfriend F.O. went to space No. 1 in the mobile home park to talk to the residents there about the dog situation. There, F.O. talked to defendant about it. F.O. also brought up the fact that someone was knocking on C.F.'s window and scaring the children. F.O. left thinking "[I]t was a squashed deal."

Later that day, C.F. was at work at a local gas station/convenience store when Hattley and two females came in. The females started yelling at her, claiming she had their dog. The group continued yelling at C.F. as she tried to help customers, so she called 911.

C.F. returned home from work a little after 11:00 p.m. She went into her house but, having forgotten something, returned to her car. Outside, she saw someone walking towards her and realized it was Hattley. C.F. knocked on her bedroom window to summon F.O. F.O. came outside, approached Hattley, asked if he was a child molester using a slang term, and then punched him. Hattley ran off.

C.F. telephoned Aaron and told him that Hattley "came after her." Around midnight, Aaron sent Michael to C.F.'s house to check on her and Aaron soon joined them. From there, F.O., Aaron, and Michael began to walk towards space No. 1 to tell the people there to stop harassing C.F. F.O. was wearing his backpack which contained two knives. He regularly carried knives and admitted he had a prior felony conviction from an incident in 2010 in which he stabbed someone.

As they approached the area, Aaron recognized defendant, Hattley, and Hattley's girlfriend, K.D. Aaron was able to see defendant clearly because "he was standing in the light" from his trailer. F.O. recognized both defendant and Hattley.

Aaron asked them to stop coming to C.F.'s house or they would call the police. Defendant and his group yelled at Aaron and his companions, calling them a racial epithet and telling them they were "all dead now."

3

According to Aaron, defendant then "came running out with an automatic rifle," yelling at them. F.O. saw that defendant had a rifle, and he heard defendant say he "was going to put some holes in" F.O. According to Aaron, defendant aimed the rifle at Aaron and fired a round. F.O. heard a gunshot. According to both Aaron and F.O., defendant pulled the trigger twice more, but the rifle misfired. After the two misfires, F.O. pulled out one of his knives and "started hacking on" defendant.

Meanwhile, Aaron saw Hattley run into the house and, when he came back out, he had a baseball bat. According to Aaron, Hattley hit Michael in the head with the bat. F.O. saw someone hit Michael in the head with a bat, but he could not tell who it was. At this time, F.O. "had two guys on him," one of whom was defendant, "and they were pulling him to the ground." F.O. heard someone say, "Shoot them, shoot that motherfucker," and "I can't, my gun's fucking jammed. I'll fucking reload it." Aaron heard someone say, "[G]et all the weapons, we'll get the fuck out of here, . . . the cops are coming." F.O. lost one of his knives at the scene.

All Michael remembered was "a gunshot and they started saying a bunch of bad names." Although Michael heard and saw a gunshot, he did not see who had the firearm. He testified it was dark in the mobile home park and that "it was really hard to see." He was not able to see anyone's face. Michael remembered at some point seeing what looked like an assault rifle on the ground.

C.F., who was at a distance from the confrontation, heard "a gunshot go off" and then heard "two more clicks, but it didn't fire." She called 911. R.F. also called 911 a little after midnight because she "heard gunshots." She subsequently testified that she heard only one gunshot.

Eventually, Aaron and F.O. made it back to C.F.'s house. C.F. was on the phone with 911 and Aaron took the phone and told the dispatcher, "[t]hey unloaded an AR-15 at us." When Michael arrived at C.F.'s house, there was blood down the side of his face, and he "could barely stand up." The "side of his face and head were pretty beaten in

4

. . . and he was bleeding all over the place." Eventually, Michael would undergo surgery, in which surgeons "remove[d] the skull from [his] brain," as well as reconstructive surgery on "the entire left side of [his] face."

Lassen County Sheriff's Deputies Cameron Miller and David Lee responded to the mobile home park. According to Deputy Miller, the area was not particularly well-lit. However, he managed to locate a large knife, though there was no blood on the blade. On a subsequent visit, he found a baseball bat with what appeared to be blood on the barrel. Law enforcement never located any cartridge casings, although Deputy Miller testified that snow on the ground made the search difficult. It is undisputed that no firearm was found.

Deputy Michael Loflin arranged for two photo lineups, one including defendant and one including Hattley. Aaron initially testified he was unable to definitively identify anyone in either lineup. He did not select anyone in the lineup in which defendant appeared. On cross-examination, he acknowledged that, in the photo lineup in which Hattley appeared, he selected a photograph and said, "[T]hat looks like him," but he denied saying that he was 100 percent sure. The parties stipulated that the deputy who administered the photo lineup with Hattley's photo would testify that Aaron "picked out Photo Number 3, but believed it to be Number 4, (Hattley), but felt the person in Photo Number 4 was too heavy. [Aaron] ultimately said he was 100 percent sure it was Photo Number 3."

F.O. did not pick defendant's photograph out of a photo lineup because the tattoo over defendant's left eyebrow "wasn't in the picture . . . . I thought it was him, but I wasn't really sure . . . ." He testified the tattoo was something that stuck out to him. As for the photo lineup that included Hattley's photograph, F.O. testified he thought he recognized someone, but it was an older photograph, and he was not sure.

Aaron was "1000 percent sure" of his in-court identifications of defendant and Hattley. F.O. was 100 percent certain.

5

Later in the day of the altercation, at 5:13 p.m. on March 6, 2022, Deputy Loflin pulled over a vehicle. The driver, K.D., was defendant's sister and Hattley's fiancé, who had been in a relationship with Hattley for eight years. Deputy Loflin asked K.D. if Hattley "was present that night." K.D. said she did not know anyone by that name. Eventually, however, she admitted to Deputy Loflin that Hattley was her fiancé, and he was present that night.

Deputy Miller testified that F.O. told him on the night of the incident that he had a knife at the fight but that he did not use it. Deputy Miller also testified that, when he initially spoke with defendant, he denied knowing Hattley. However, defendant then acknowledged Hattley was his sister's fiancé and stated that he had known Hattley for just two days. Deputy Miller then identified defendant, Hattley, and K.D. in a photograph from a law enforcement safety bulletin that Deputy Miller had seen in August or September 2021, approximately six months before the fight. An investigator for the district attorney's office located Facebook profile pages for defendant and Hattley. A post on defendant's page dated March 8, 2022, in which he tagged Hattley, was a parody video with the caption, "gang bangin [*sic*] in the suburbs." (Capitalization omitted.) A post on Hattley's page was a GIF of someone swinging a baseball bat. Another post on Hattley's page, posted on March 8, 2022, stated, "We ain't even kno [*sic*] dude he made hisself [*sic*] a target." (Capitalization omitted.)

*The Trial—Relevant Portions of the Defense Case*

K.D., defendant's sister and Hattley's fiancé, also testified for the defense. She lived at space No. 1 in the mobile home park. She testified that she witnessed the fight and she did not hear any gunshots. Nor did she see defendant with a firearm. She testified that Hattley was not there, as he had left the mobile home park after he retrieved K.D.'s dog. After the fight, K.D. drove defendant to the hospital because he had sustained multiple knife wounds. K.D. did not recall when defendant got the tattoo over

6

his left eye, but he did not have it at the time of the fight.  K.D. admitted that, when Deputy Loflin pulled her over, she lied at first "and then I later corrected my lie."

*Verdict and Sentencing*

The jury found defendant guilty of attempted murder and found true the two firearm enhancement allegations.  The jury found defendant guilty of assault with a firearm on Aaron; not guilty of assault with a firearm on F.O., but guilty of the lesser included offense of simple assault; and guilty of being a felon in possession of a firearm and of discharging a firearm with gross negligence.  The trial court sentenced defendant to 17 years in prison consisting of the middle term of seven years on count I and 10 years for the section 12022.53, subdivision (b) firearm enhancement.  The court imposed and, pursuant to section 654, stayed the upper term of four years on count IV, six months on count V, upper terms of three years on counts VI and VII, and the 20-year term on the section 12022.53, subdivision (c) firearm enhancement.

DISCUSSION

I

*Impeachment of K.D.*

A.      *Additional Background*

During the prosecutor's cross-examination of K.D. when she was testifying for the defense, the prosecutor asked her if she was honest with Deputy Loflin.  K.D. acknowledged that she lied at first.  The exchange continued:

"[PROSECUTOR]:  Okay.  This day on March 6th, this was not your first time being dishonest with law enforcement, was it?

"[K.D.]:  I don't recall lying to them before that, no.

"[PROSECUTOR]:  Not necessarily in this case, but you've lied to police before, correct?

"[K.D.]:  I haven't been in trouble in Lassen County at all before that.

7

"[PROSECUTOR]:  Not necessarily in Lassen County, but ma'am, you were convicted of providing a false identification to a peace officer in 2016 down in San Jose?

"[K.D.]:  I don't recall.  That was a long time ago.

"[PROSECUTOR]:  Six years, you don't remember being convicted of a crime six years ago?

"[K.D.]:  What was the crime, may I ask?  I don't recall getting in trouble in San Jose.

"[PROSECUTOR]:  Sure, for giving false information to a peace officer.

"[K.D.]:  I don't recall.

[¶] . . . [¶]

"[PROSECUTOR]:  Ma'am, can you–there's a name on this document.  Do you recognize that name?

[¶] . . . [¶]

"[K.D.]:  I see my name.

"[PROSECUTOR]:  You see your name on that document?

"[K.D.]:  Yeah.

[¶] . . . [¶]

"[PROSECUTOR]:  Okay, thank you.  And if I may direct your attention to page 3 of this document, right there at the top, do you see the top there where it gives a date from 2016 and it says San Jose?

"[K.D.]:  Yes.

"[PROSECUTOR]:  Okay.  And then there are two entries below it that look like they have some code sections.

"[K.D.]:  Yes.

"[PROSECUTOR]:  And do you see the one there that says P.C. or Penal Code Section 148.9?

"[K.D.]:  Yes.

8

"[PROSECUTOR]: All right. And the explanation for that code section that says false identification to a peace officer.

"[K.D.]: Yeah, I see that.

"[PROSECUTOR]: Okay. And you see a few lines down where it says misdemeanor and that you were convicted of that offense?

"[K.D.]: I guess, yeah. I don't remember being in trouble for that, though.

"[PROSECUTOR]: Okay. I'll retrieve this document, thank you."

After this exchange, the prosecutor sought permission to impeach K.D. with a prior conviction of misdemeanor prostitution. The trial court ruled that it would permit this impeachment. When K.D. resumed her testimony, the prosecutor first confirmed that K.D. did not recall a conviction for giving false information to a peace officer, which she did not. Then, the following exchange occurred:

"[PROSECUTOR]: Okay. You were also convicted in 2016 of prostitution?

"[K.D.]: Yes. I remember that.

"[PROSECUTOR]: You do[,] you recall that one, okay."

B.      *The Parties' Contentions*

Defendant asserts the trial court erred in allowing the prosecutor to impeach K.D. with the 2016 misdemeanor prostitution conviction. The People respond that misdemeanor prostitution is a crime of moral turpitude, but further concede that the trial court erred in permitting the impeachment with only the *fact* of the conviction rather than the underlying *conduct*. We conclude the trial court erred in permitting this impeachment.

C.      *Analysis*

An appellate court reviews the trial court's admission of impeachment evidence for abuse of discretion. (*People v. Turner* (2017) 13 Cal.App.5th 397, 408.) Under the abuse of discretion standard, the trial court's conclusions of law are reviewed de novo. (*Camacho v. Superior Court of Merced County* (2023) 15 Cal.5th 354, 383.)

9

" 'Past criminal conduct involving moral turpitude that has some logical bearing on the veracity of a witness in a criminal proceeding is admissible to impeach, subject to the court's discretion under Evidence Code section 352.' " (*People v. Smith* (2007) 40 Cal.4th 483, 512; accord, *People v. Clark* (2011) 52 Cal.4th 856, 931 ["A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352 [fn. omitted]"].) " 'Misdemeanor convictions . . . are not admissible for impeachment, although evidence of the underlying *conduct* may be admissible subject to the court's exercise of discretion.' " (*People v. Hall* (2018) 23 Cal.App.5th 576, 589, quoting *People v. Chatman* (2006) 38 Cal.4th 344, 373.)

Here, the trial court permitted the prosecution to impeach K.D. with the *fact* of her 2016 misdemeanor prostitution conviction rather than any underlying *conduct*. As the People correctly concede, this was in error.

D. *Prejudice*

Defendant contends this impeachment "was prejudicial because it harmed a key component of the defense's case despite having no bearing on K.D.'s veracity." In addition to violating statutory law, defendant asserts the impeachment violated his right to due process because it allowed the jury to make an improper and irrational inference as to K.D.'s veracity based on a conviction that was not one of moral turpitude per se. (See *People v. Gomez* (2018) 6 Cal.5th 243, 290 [permissive inferences are constitutionally suspect when there is no rational way trier of fact could make the connection permitted by the inference].) He asserts the error was prejudicial under any standard.

The People assert the error was harmless. They argue that K.D. was effectively impeached with a prior conviction of providing false identification to a police officer, and that she also admitted that she lied to Deputy Loflin. According to the People, impeachment with the prostitution conviction was cumulative.

We conclude the error was harmless under any standard.

10

Under the standard applicable to assess prejudice for state law error, the erroneous admission of evidence to impeach a witness's credibility is harmless "if a review of the entire record demonstrates 'it is not reasonably probable that a result more favorable to defendant would have occurred in the absence of error.' " (*People v. Bedolla* (2018) 28 Cal.App.5th 535, 555; see *People v. Watson* (1956) 46 Cal.2d 818, 836.) As for defendant's contention that the admission of this evidence violated his due process rights, "the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) Where "the erroneous admission of evidence results in a fundamentally unfair trial in violation of an appellant's constitutional rights, the appellate court will reverse unless the error is harmless beyond a reasonable doubt." (*People v. Rouston* (2024) 99 Cal.App.5th 997, 1016; see *Chapman v. California* (1967) 386 U.S. 18, 24.) To determine whether the People can demonstrate that an error was harmless beyond a reasonable doubt, "we examine the entire record and must reverse if there is a ' " 'reasonable possibility' " ' that the error contributed to the verdict." (*People v. Reese* (2017) 2 Cal.5th 660, 671.)

We first address what the People contend to be the proper impeachment of K.D. with a conviction of providing false identification to a peace officer. To the extent that the prosecutor attempted to impeach K.D. with the *fact* of this conviction rather than the underlying *conduct*, this, too, would amount to impeachment with the mere fact of a misdemeanor conviction. (See § 148.9, subds. (a), (b).) More importantly, the prosecutor did not *successfully* impeach K.D. with this conviction. The prosecutor asked K.D. about the conviction at length and K.D. never admitted to the conviction and testified repeatedly that she did not recall it. The prosecutor then presented K.D. with a document to refresh her recollection. However, this effort failed, as K.D. testified after reviewing the document that "I don't remember being in trouble for that, though." Additionally, after a brief recess, the prosecutor again confirmed that K.D. did not recall this

11

conviction. Moreover, the document with which the prosecutor sought to refresh K.D.'s recollection was not identified, described, or admitted into evidence, and it is not part of the record on appeal. Absent any acknowledgment by K.D. of the conviction and underlying conduct, and any documentary evidence thereof, we cannot conclude K.D. was successfully impeached with this conviction.

Turning to our assessment of prejudice, the case against defendant was strong. Defendant does not dispute that he participated in the fight. Detective Scott Ducasse testified defendant admitted he participated in the fight. As the altercation between the two groups commenced, Aaron recognized defendant as one of the combatants. He could see defendant clearly because defendant "was standing in the light" from his trailer. F.O. also saw defendant at the scene. Aaron saw defendant when he "came running out with an automatic rifle." F.O. also saw defendant with a rifle. Aaron then saw defendant aim his rifle and fire a round at him. F.O. heard the gunshot. According to both Aaron and F.O., defendant pulled the trigger twice more, but the firearm misfired.

It is true that law enforcement never located a firearm or cartridge casing. However, in addition to Aaron seeing the rifle and defendant firing it at him, F.O., Michael, C.F., and R.F. all heard a gunshot. And, in addition to both Aaron and F.O. witnessing defendant pulling the trigger twice more only for the rifle to misfire, C.F. heard "two more clicks, but it didn't fire." Michael saw what looked like an assault rifle at the scene. F.O. testified that, after the two misfires, he pulled out one of his knives and "started hacking on" defendant, and defendant in fact sustained multiple knife wounds. Additionally, F.O. heard someone say, "Shoot them, shoot that motherfucker," and "I can't, my gun's fucking jammed. I'll fucking reload it," and Aaron heard someone say, "[G]et all the weapons, we'll get the fuck out of here, . . . the cops are coming." When Aaron spoke to the 911 dispatcher immediately after the incident, he reported that "[t]hey unloaded an AR-15 at us." Moreover, law enforcement's search for cartridge casings was hampered by the snow on the ground.

12

Conversely, for the defense, K.D., testified that she saw the fight, she did not hear any gunshots, and she did not see defendant with a firearm. Additionally, while F.O. suggested he did not pick defendant's photograph out of the photo lineup because defendant's tattoo, which had "stuck out" to F.O., did not appear in the photo, K.D. testified defendant did not have the tattoo at the time of the fight, suggesting the possibility that F.O.'s explanation for failing to pick defendant out of the photo lineup was a fabrication. She also identified a photograph of defendant from his Facebook page, posted on March 4, 2022, before the fight. Presumably, the purpose of this photograph was to show defendant did not have the tattoo over his eye around the time of the fight. However, while the photograph may have been posted on March 4, there is no evidence as to when it was taken.

In any event, K.D.'s testimony gave rise to an evidentiary conflict with the prosecution's evidence for the jury to resolve. Based on its verdicts and enhancement allegation findings, the jury necessarily resolved these evidentiary conflicts by concluding defendant did have a gun and that he fired it.

Relevant to K.D.'s credibility, in addition to observing her testimony and demeanor, the jury learned that, when she was pulled over, she initially lied to Deputy Loflin, saying that she did not know Hattley, her fiancé. Later in the exchange, K.D. admitted she knew Hattley and he was present that night. In her testimony, K.D. admitted that she "told a lie at first and then I later corrected my lie." The jury also heard K.D.'s trial testimony that Hattley was not at the fight, as he had left the mobile home park after he retrieved K.D.'s dog. This contradicted K.D.'s statement to Deputy Loflin that Hattley was present that night. These matters were directly relevant to K.D.'s truthfulness and credibility.

The erroneous but cursory admission of impeachment evidence that K.D. had a misdemeanor prostitution conviction in 2016 had far less impact on or relevance to her credibility than her willingness to lie to law enforcement as demonstrated by her

13

admission that she lied to Deputy Loflin during the vehicle stop. As defendant's sister and Hattley's fiancé, K.D. was also an interested witness, a matter about which the jurors were instructed. (CALCRIM No. 105 ["Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?"].) Additionally, the prosecutor did not reference the prostitution conviction in her closing arguments, although defense counsel alluded to it. We cannot agree with defendant that the evidence of K.D.'s misdemeanor prostitution conviction was "likely to have had an outsized influence on the jury." On the contrary, we conclude this evidence was insignificant in the context of the evidence as a whole and unlikely to affect the jurors' assessments of K.D.'s credibility.

Based on our review of the record, we conclude there is not a reasonable possibility that K.D.'s brief concession that she recalled being convicted of misdemeanor prostitution in 2016 contributed to the jury's verdict. Accordingly, we conclude the error in admitting this testimony was harmless under any standard and its admission did not render defendant's trial fundamentally unfair.

II

*Prosecutorial Misconduct and Ineffective Assistance of Counsel*

Defendant asserts that the prosecutor committed misconduct in her closing arguments by (1) diluting the burden of proof, (2) vouching for witness credibility by arguing facts not in evidence, and (3) appealing to the jurors' emotions. The People counter that defendant forfeited these claims by failing to object to the challenged remarks. Defendant urges us to exercise our discretion to reach these contentions, and, in the alternative, argues that the failure to object to the prosecutor's misconduct constituted ineffective assistance of counsel.

Defendant has forfeited his claims of prosecutorial misconduct. Further, we conclude defendant's attorney's failure to object to the alleged instances of misconduct did not prejudice defendant.

14

" 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.]  Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' " (*People v. Parson* (2008) 44 Cal.4th 332, 359.)

To preserve a claim of prosecutorial misconduct, a "defendant must generally object 'in a timely fashion—and on the same ground,' and must 'request[] that the jury be admonished to disregard the impropriety.' " (*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 29.)  As defendant acknowledges, his attorney did not object to the alleged instances of misconduct during the prosecutor's closing arguments.  Thus, he has forfeited his contentions.

While we do have the discretion to excuse forfeiture, exercising such discretion should be done sparingly, and only in cases that present an important legal issue.  (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.)  The forfeiture requirement serves an important purpose.  Defendants must raise prosecutorial misconduct during trial, where it can be remedied at once in a far more efficient and effective manner than on appeal.  (See *People v. Peoples* (2016) 62 Cal.4th 718, 801 [reason for the forfeiture rule is that the trial court should be given the opportunity to correct misconduct of counsel and thus, if possible, prevent the harmful effect on the minds of the jurors].)

Turning to defendant's alternative contention, to prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant.  (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.)  To demonstrate prejudice, a defendant must show a reasonable probability that the defendant

would have achieved a more favorable result had counsel's performance not been deficient.  (*Strickland, supra*, at pp. 693-694; *Ledesma, supra*, at pp. 217-218.)

"[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.  In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."  (*Strickland v. Washington, supra*, 466 U.S. at p. 697.)

We will turn directly to an analysis of prejudice as to each of defendant's claims of misconduct.  While the prosecutor's statements may have been ill-advised, there is not a reasonable probability that defendant would have achieved a more favorable result had his trial counsel objected to the challenged remarks.

A.      *Dilution of the Burden of Proof Beyond a Reasonable Doubt*

The prosecution bears the burden of proving all elements of the crimes charged beyond a reasonable doubt.  (*In re Winship* (1970) 397 U.S. 358, 364.)

In her initial closing argument, the prosecutor addressed the beyond a reasonable doubt standard:  "[T]he court keeps saying beyond a reasonable doubt, beyond a reasonable doubt.  The People have a burden beyond a reasonable doubt.  The defense attorneys are going to get up here and . . . they are going to make this burden the government has to be some insurmountable, just impossible goal, you're never going to get there.  In fact, one of them or both of them may even put up this little chart that's going to have the different standards of proof and the burden of proof is going to be way up here and they're going to make it sound like there's no possible way that we ever get there.  That's not the standard, ladies and gentlemen.  *It's what is reasonable.*  It's okay to go back there and deliberate with some doubt, but is that doubt reasonable?  *And that's what you're looking at, what makes sense.  Let's make it make sense.*"  (Italics added.)

16

Defendant asserts the prosecutor diluted the burden of proof by equating proof beyond a reasonable doubt with what "makes sense." He argues it is improper for a prosecutor to "equate the standard of proof beyond a reasonable doubt to a determination of what is reasonable." Defendant contends that the prosecutor's invitation to the jury to join her in "mak[ing] it make sense" did not reflect the prosecution's burden of proof beyond a reasonable doubt.

These remarks were brief, isolated, and insignificant in the context of the prosecutor's argument as a whole. (See generally *People v. Covarrubias* (2016) 1 Cal.5th 838, 894 [reviewing court considers prosecutor's assertedly improper remarks in the context of the argument as a whole].)

To the extent the prosecutor's remarks could be deemed to misstate the burden of proof, they would have contradicted the trial court's instructions. The trial court instructed the jurors, before and after the presentation of evidence: "A defendant in a criminal case is presumed to be innocent. The presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant's guilt beyond a reasonable doubt, [he is] entitled to an acquittal and you must find [him] not guilty." (CALCRIM Nos. 103, 220.) The court also instructed the jury: "If you believe the attorneys comments on the law conflict with my instructions, you must follow my instructions." (CALCRIM No. 200.) The court provided the jurors with the written jury instructions during deliberations. (See *People v. Cortez* (2016) 63 Cal.4th 101, 133 [rejecting a misconduct claim challenging prosecutor's

17

comments on reasonable doubt based on, among other factors, the fact that the court properly defined reasonable doubt and the jury had written instructions during deliberations].)  "The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so."  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196.)

In *People v. Centeno* (2014) 60 Cal.4th 659 (*Centeno*), on which defendant principally relies, one of the problems with the prosecutor's argument was that it "strongly implied that the People's burden was met if its theory was 'reasonable' in light of the facts supporting it."  (*Id*. at p. 671.)  "The prosecutor told the jury that in reaching its decision it must reject impossible and unreasonable inferences, and only consider reasonable possibilities.  She stated that 'your decision has to be in the middle.  It has to be based on reason.  It has to be a reasonable account.' "  (*Ibid*.)  The Supreme Court stated that it was not a sufficient statement of the standard of proof "that the jury simply believe that a conclusion is reasonable.  It must be convinced that all necessary facts have been proven beyond a reasonable doubt."  (*Id*. at p. 672.)  "The prosecutor, however, left the jury with the impression that so long as her interpretation of the evidence was reasonable, the People had met their burden.  The failure of the prosecutor's reasoning is manifest."  (*Ibid*.)  The Supreme Court stated, "[I]t is error for the prosecutor to suggest that a 'reasonable' account of the evidence *satisfies the prosecutor's burden of proof*."  (*Ibid*.)  The Supreme Court concluded that the prosecutor "confounded the concept of rejecting unreasonable inference with the standard of proof beyond a reasonable doubt.  She repeatedly suggested that the jury could *find defendant guilty* based on a 'reasonable' account of the evidence.  These remarks clearly diluted the People's burden."  (*Id*. at p. 673.)  Reversing based on the defendant's ineffective assistance of counsel claim, our Supreme Court concluded:  "Given the closeness of the case and the lack of any corrective action, there is a reasonable probability that the prosecutor's argument caused

18

one or more jurors to convict defendant based on a lesser standard than proof beyond a reasonable doubt." (*Id*. at p. 677.)

We distinguish *Centeno* and the effect of potentially improper argument on several grounds. First, the problematic language in *Centeno* was more abundant and widespread than the prosecutor's brief, isolated remarks here. Second, those remarks in *Centeno* compounded the issue of the dilution of the burden of proof. The prosecutor in that case also improperly attempted to illustrate the standard of proof by using a visual aid, specifically an outline of the State of California, and asking jurors what state it depicted.[3] (*Centeno, supra*, 60 Cal.4th at p. 670.) Third, in *Centeno*, the prosecutor's dilution of the burden of proof "came in rebuttal, [and] defense counsel had no opportunity to counter it with argument of his own." (*Id*. at p. 676.) Here, the prosecutor's remarks were not "the last word on the subject" (*id*. at p. 677), because she made her remarks in her initial closing argument, affording defense counsel the opportunity to address the beyond a reasonable doubt burden in closing, which they did. Fourth, as the People conceded in *Centeno*, that "was a very close case." (*Ibid*.) Such is not the case here, as we now discuss.

Again, it is undisputed defendant participated in the fight. Aaron and F.O. both saw defendant with a rifle. Aaron saw defendant fire the rifle at him. Aaron and F.O. both saw defendant pull the trigger twice more, but the rifle misfired. In addition to

---

[3] We stated above that the prosecutor's remarks would have contradicted the trial court's instructions, and that the court directed the jurors to follow its instructions in the event of such a conflict. (CALCRIM No. 200.) Relying on *Centeno*, defendant suggests the jury would not have known to reject the prosecutor's misrepresentations in favor of the court's instructions. It appears that, in the language on which defendant relies, the Supreme Court was referring to the use of the visual aid and the related hypothetical, not the discussion of reasonableness, when it stated the prosecutor's representations "did not directly contradict the trial court's instruction on proof beyond a reasonable doubt, but instead purported to illustrate that standard," and thus there "was no reason for the jury to reject the prosecutor's hypothetical." (*Centeno, supra*, 60 Cal.4th at p. 676.)

Aaron and F.O., Michael, C.F., and R.F. all heard a gunshot, and C.F. heard the two misfires. Michael saw the rifle at the scene. F.O. testified that, after the two misfires, he pulled out one of his knives and "started hacking on" defendant, and defendant did sustain multiple knife wounds. Aaron immediately reported the shooting to 911. Although neither Aaron nor F.O. picked defendant's photograph out of a photo lineup, both were certain of their identifications of him at trial. Shortly after the fight, defendant denied knowing Hattley, and then said he met him two days prior, but the evidence demonstrated Hattley was defendant's sister's fiancé, Hattley and K.D. had been in a relationship for eight years, and defendant appeared in a photograph with Hattley that Deputy Miller observed approximately six months before the fight. These facts suggest the possibility defendant misled law enforcement based on consciousness of guilt. Additionally, days after the fight, defendant posted on his Facebook page a parody video with the caption, "gang bangin [*sic*] in the suburbs," and tagged Hattley on the post. (Capitalization omitted.) Weighed against this evidence was only the testimony of K.D., defendant's sister, who admitted to previously lying to law enforcement, who testified defendant did not have a gun and she did not hear a gunshot.

The prosecution case against defendant was strong, notwithstanding the fact that K.D. contradicted the prosecution witnesses, the prosecution witnesses' accounts differed in some respects, and neither a firearm nor a cartridge casing was ever found. These circumstances stand in contrast to *Centeno*, in which the "prosecution depended almost entirely" on the credibility of the victim (*Centeno, supra*, 60 Cal.4th at p. 677), who was seven years old at the time of the events at issue and 10 years old at trial (*id*. at pp. 662, 663), and who provided an inconsistent account, initially denied the sexual abuse at issue under oath before reversing course, was unwilling to answer numerous questions, and whose account lacked corroboration (*id*. at pp. 663, 670).

20

We conclude there is not a reasonable probability defendant would have achieved a more favorable result had counsel objected to the prosecutor's brief remarks addressed to the beyond a reasonable doubt burden of proof.

B.      *Vouching for Witnesses with Facts Not in Evidence*

In her rebuttal closing argument, the prosecutor addressed the fact that neither Aaron nor F.O. identified defendant or Hattley in the photo lineups. She posed the question to the jurors: "You may see somebody clearly at a time, but then you're asked to identify them from a photograph and unless you're overly familiar with them, ask yourself if you could pick these people, . . . out of these lineups." She discussed the fact that lineups are constructed "to not suggest the suspect, and in this case, it confused the individuals because they were not–they don't know them and so they were not able to pick them out of a lineup."

The prosecutor then recounted a story from her own personal experience: "When I was 20, I worked at a bank and I got robbed and I, as I stand here before you today, I can close my eyes and I can see crystal clear the person who robbed me 22 years ago. The FBI came down. Can you pick him out of a lineup? I am 100 certain I can pick him out of a lineup, his face is etched into my brain, he's burned into my retinas. I wish. I could not pick him out of a lineup. Does that mean I didn't get robbed? No. I couldn't pick him out. I can see him today. Wouldn't know him walking down the street. Couldn't pick him out of a lineup. It's normal. This is a normal thing."

The prosecutor later returned to the topic of the witness identifications of defendant and Hattley: "The in court identification of the defendants. Oh, it's only because right now, because they're right now in front of them that they recognize who they are. Well, they hadn't seen them. I asked each defendant–or excuse me, each witness, have you had any contact with any of these individuals since the date of the incident? No, no, I have not. They haven't seen them since March 6th. Now, they're seeing them in court. Oh, yeah, yeah, that's them. This is not nefarious, this isn't a plot,

they're not in cahoots together.  This is normal, natural reactions under the circumstances."

" 'Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument.' [Citation.]  Referring to facts not in evidence is 'clearly' misconduct 'because such statements "tend[] to make the prosecutor his own witness—offering unsworn testimony not subject to cross-examination." ' " (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480.)

Clearly the prosecutor's story about being unable to identify a bank robber in a lineup relied on facts outside the record, and her assurance that such a misidentification "is a normal thing" could be understood as indicating that misidentifications frequently occur in other cases.  (See *People v. Medina* (1995) 11 Cal.4th 694, 758 ["prosecutors should not purport to rely on their outside experience or personal beliefs based on facts not in evidence when they argue to the jury"].)

While these remarks were improper, defendant was not prejudiced.  The trial court instructed the jury, before and after the presentation of evidence:  "Nothing that the attorneys say is evidence.  In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence . . . ."  (CALCRIM Nos. 104, 222.)  And, again, the court instructed the jury, "If you believe the attorneys comments on the law conflict with my instructions, you must follow my instructions." (CALCRIM No. 200.)  In the absence of any contrary indication, we presume the jury followed the court's instructions.  (*People v. Letner and Tobin, supra*, 50 Cal.4th at p. 196.)

Even if the prosecutor had not shared her story about being unable to identify a bank robber in a lineup, the jury very likely still would have found Aaron's and F.O's in-court identifications of defendant reliable and credited them.  We conclude there is not a

22

reasonable probability defendant would have achieved a more favorable result had counsel objected to the prosecutor's remarks concerning her personal experience and her related remarks concerning Aaron and F.O.'s failure to identify defendant in a photo lineup.

C.      *Appeal to the Jurors' Emotions*

As she completed her rebuttal closing argument, the prosecutor stated:  "I don't get to pick my witnesses . . . .  You can't pick your family, they don't get to pick their defendants, I don't get to pick my witnesses, although I suppose it's not all the way true, I do as the district attorney, I do get pick what cases I file.  I had to file Michael's case.  That's a case I–somebody needs to be held accountable for it.  Mr. Hattley needs to be held accountable for what happened to Michael.  It's very important for the People in the State of California, in and for the County of Lassen, to get justice for Michael . . . , and so I'm asking you what is your brand of justice for Michael . . . ?"

" 'It is, of course, improper to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." ' " (*People v. Redd* (2010) 48 Cal.4th 691, 742.)

Asking the jurors about their "brand of justice for Michael" could be understood as appealing to the jurors' personal notions of justice as distinct from any legal standard.  However, again, the trial court instructed the jurors:  "If you believe the attorneys comments on the law conflict with my instructions, you must follow my instructions." (CALCRIM No. 200.)  The trial court instructed the jury on the elements of every crime charged and enhancement alleged (CALCRIM Nos. 600, 603, 875, 915, 970, 2511, 3145, 3146, 3148) and on the prosecution's burden of proof beyond a reasonable doubt (CALCRIM No. 220).  We presume the jury followed the court's instructions.  (*People v. Letner and Tobin, supra*, 50 Cal.4th at p. 196.)  Additionally, we do " ' "not lightly infer"

23

that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1129.)

We conclude there is not a reasonable probability defendant would have received a more favorable result had counsel objected to the prosecutor's remark asking the jurors about their "brand of justice for Michael . . . ."

D.    *Conclusion*

We have determined that defendant was not prejudiced when his claims are considered individually. Considered together, we reach the same conclusion. (See *People v. Burgener* (2003) 29 Cal.4th 833, 876 [addressing alleged instances of misconduct cumulatively after assessing them individually].)

III

*Cumulative Error*

Defendant asserts that, even if the improper impeachment of K.D. and the prosecutor's misconduct/ineffective assistance of counsel were not prejudicial individually, they were cumulatively prejudicial. The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect may require reversal. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237, disapproved on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176.) We have found no prejudice when considering defendant's claims separately. Viewed cumulatively, our conclusion is the same. Defendant was not deprived of a fair trial.

IV

*Defendant's Second Amendment Challenge to Section 29800*

Defendant asserts that his conviction for possessing a firearm as a felon under section 29800, subdivision (a)(1) violated the Second Amendment as analyzed under *New York State Rifle & Pistol Assn., Inc. v. Bruen* (2022) 597 U.S. 1 (*Bruen*). Defendant specifies he is only raising an as-applied challenge to the statute, not a facial challenge. (See generally *People v. Miller* (2023) 94 Cal.App.5th 935, 940, fn. 2 [describing as-

24

applied challenges].)  He asserts that section 29800 is unconstitutional as applied to him because he has suffered only nonserious, nonviolent, and non-firearm-related felony convictions.

"An as-applied constitutional challenge is forfeited unless previously raised." (*People v. Patton* (2019) 41 Cal.App.5th 934, 946, citing *In re Sheena K.* (2007) 40 Cal.4th 875, 889.)  We requested supplemental briefing on whether defendant forfeited his as-applied challenge by failing to raise it in the trial court.  In their supplemental briefing, the parties agreed that defendant's argument raised an issue of law on undisputed facts, and, as such, we may decide the issue notwithstanding defendant's failure to raise it below.  We decline to do so.

"Generally, issues not raised in the trial court cannot be raised for the first time on appeal."  (*Wisner v. Dignity Health* (2022) 85 Cal.App.5th 35, 44.)  "Although appellate courts have discretion to consider an issue in the first instance if it raises a question of law on undisputed facts, our Supreme Court has cautioned that such discretion should be exercised rarely and only in cases presenting an important legal issue."  (*Id*. at p. 44; see *In re Sheena K., supra*, 40 Cal.4th at p. 887, fn. 7; *In re S.B., supra*, 32 Cal.4th at p. 1293.)  "There is no rule . . . that an appellate court *must* consider a pure question of law raised for the first time on appeal.  Instead, the decision to do so or not 'is largely a question of the appellate court's discretion.' "  (*Souza v. Westlands Water Dist.* (2006) 135 Cal.App.4th 879, 898-899; accord, *Wittenberg v. Bornstein* (2020) 51 Cal.App.5th 556, 567; *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767; *Morales v. California Dept. of Corrections & Rehabilitation* (2008) 168 Cal.App.4th 729, 741.)

Here, we are not addressing a ruling to which no objection was raised, but an entire substantive theory—the unconstitutionality of the charging statute as applied to defendant—that was not litigated at all in, or decided by, the trial court (cf. *Souza v. Westlands Water Dist., supra*, 135 Cal.App.4th at p. 899), despite the fact that *Bruen* was decided two months before defendant's trial (*Bruen, supra*, 597 U.S. 1).  We decline to

exercise our discretion to reach defendant's belatedly raised contention that his prosecution as a felon in possession of a firearm violated the Second Amendment post-*Bruen*. (See *Zachary H. v. Teri A.* (2023) 96 Cal.App.5th 1136, 1143-1144 [declining to consider as-applied Second Amendment challenge to firearms restriction imposed by the trial court in conjunction with domestic violence restraining order because the defendant forfeited the claim by failing to object in trial court].)

We further note that, in *Bruen*, the Supreme Court held "that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " (*Bruen, supra*, 597 U.S. at p. 17.) Whether a challenged regulation is consistent with this nation's historical tradition of firearm regulation may be established by determining whether there exists a "relevantly similar" historical analogue to the regulation, taking into consideration "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." (*Id*. at p. 29). This part of the inquiry, if necessitated by a finding that the Second Amendment covered the individual's conduct, would involve the proffer and analysis of such historical analogues. We conclude this process is more appropriately undertaken in the first instance in the trial court. This, too, militates against exercising our discretion to consider defendant's belatedly raised argument for the first time on appeal.

We also are not persuaded by defendant's alternative argument in his supplemental briefing that objection would have been futile in the face of binding Court of Appeal precedent, specifically *People v. Delacy* (2011) 192 Cal.App.4th 1481 and *People v. Flores* (2008) 169 Cal.App.4th 568. "Decisions of every division of the District Courts

26

of Appeal are binding upon . . . all the superior courts of this state . . . ." (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455.)  The state superior courts must follow the law declared by the state appellate courts on federal questions unless the United States Supreme Court has decided the same question differently.  (Cf. *Truly Nolen of America v. Superior Court of San Diego County* (2012) 208 Cal.App.4th 487, 507 ["On federal statutory issues, intermediate appellate courts in California are absolutely bound to follow the decisions of the California Supreme Court, unless the United States Supreme Court has decided the *same* question differently"].)

In *Bruen*, the United States Supreme Court completely altered the Second Amendment landscape.  The Supreme Court in *Bruen* rejected the " 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny" around which the Courts of Appeals had "coalesced" in the years since *District of Columbia v. Heller* (2008) 554 U.S. 570 and *McDonald v. City of Chicago, Ill.* (2010) 561 U.S. 742 were decided.  (*Bruen, supra*, 597 U.S. at p. 17.)  " '*Bruen* effected a sea change in Second Amendment law' by replacing this tiers-of-scrutiny framework with one grounded exclusively in text and history." (*United States v. Duarte* (9th Cir. 2024) 101 F.4th 657, 665, rehg. en banc granted, opinion vacated (9th Cir. 2024) 108 F.4th 786.)  Based on this drastic change in Second Amendment jurisprudence, we cannot conclude an objection based on *Bruen* would have been futile.  Additionally, an objection based on *Bruen* would not have required defendant "to anticipate unforeseen changes in the law . . . ." (*People v. Perez* (2020) 9 Cal.5th 1, 9.)  Again, *Bruen* was decided two months before defendant's trial.  We conclude defendant has forfeited his claim.

## DISPOSITION

The judgment is affirmed.

_____\s_____,
Krause, J.

We concur:

_____\s_____,
Renner, Acting P. J.

_____\s_____,
Mesiwala, J.